Filed 4/21/25  P. v. Bomar CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C099453 |
| Plaintiff and Respondent, | (Super. Ct. No. P18CRF01132) |
| v. | |
| CHASE LEONARD BOMAR, | |
| Defendant and Appellant. | |

Following a jury trial, Chase Leonard Bomar and his brother, Cody, were convicted of second degree murder for stabbing a man to death.[1]  On appeal, Chase contends the trial court erred in the following ways:  (1) failing to instruct on the absence of self-defense as an element of murder, (2) failing to instruct on defense of property, (3) including inapplicable language in the voluntary manslaughter instruction regarding the "cooling-off" period after provocation, (4) excluding evidence about one witness's

---

[1]  For clarity, we will refer to the brothers by their first names.

prior misconduct, and (5) excluding evidence about the victim's temper. Chase further contends that cumulative error deprived him of a fair trial. Finding no reversible error, we affirm.

## BACKGROUND

The charges in this case stem from the killing of Jeremy Fortuin. Fortuin formerly lived in a house with, among others, Cody, Cody's girlfriend, and the girlfriend's parents, Johnny R. and Tanya J. Chase visited, but did not stay there. Everyone moved out after the house was "red-tagged," that is, after local authorities deemed the house unfit to inhabit. According to Johnny, Fortuin removed all of his property.

Fortuin had a history of violent encounters with several people, including residents of the red-tagged house. For example, Tanya testified that when a woman named Elisa kicked Fortuin in the back of the leg, Fortuin responded by punching her in the head and knocking her unconscious before he dragged her down the driveway by her hair. Johnny also testified that about four years before the murder, Fortuin responded to something Johnny said about clothing by punching Johnny in the face. Johnny also witnessed Fortuin slap Johnny's brother without apparent provocation. On another occasion, Fortuin punched Johnny's brother in the back of the head then tore out "a big chunk of hair" from the brother's head and hung the hair on a tree. Fortuin also had a 2009 conviction for corporal injury to a significant other resulting in a traumatic condition in violation of Penal Code section 273.5.[2]

Five weeks before Fortuin's death, Chase and Cody went to the red-tagged house to remove property. Among other items, there were two inoperable cars there, one of which belonged to Cody. While the brothers were there, Fortuin and at least four other men came over carrying pipes or bats. The brothers then heard some noises, leading

---

[2] Undesignated statutory references are to the Penal Code.

2

them to believe that Fortuin and the others had broken into the house. When the brothers confronted Fortuin, he accused them of stealing his generator and swung a pipe. He ultimately struck both brothers in the forearm, hitting Chase hard enough to leave a visible mark. Fortuin also broke a window and smashed car windshields.

Later that same day, Johnny and Tanya went to a house where Fortuin stored his possessions, believing they might find Johnny's son's stolen motorcycle. Not finding the motorcycle, Tanya decided to take Fortuin's television. But before she could leave with it, Fortuin appeared. He grabbed her from behind then swung his arms at her like a windmill. Before Fortuin struck anyone, Tanya hit him with a golf club and Johnny hit him with a pipe.

On the day of the murder five weeks later, Chase, Cody, Johnny, Tanya, and Cody's girlfriend returned to the red-tagged house to remove Johnny's and Tanya's property. Fortuin was at a nearby house at the time visiting a woman he dated, Sabrina R.[3] Fortuin told Sabrina he had a car with a battery at the red-tagged house and they walked over to retrieve it for a friend.

On reaching the red-tagged house, Fortuin started walking up the driveway. Sabrina heard Johnny say, "Hey, you want to fuck with me?" Tanya screamed, "There's Jeremy." Both Johnny and Tanya saw Fortuin approach and believed he carried a stick. Sabrina denied that he carried a stick or other weapon. All three witnesses agreed that they never saw Fortuin pull out any stick from his sleeve or anywhere else. All witnesses also agreed that Fortuin never reached the house. Shortly after reaching the driveway, he turned around and started walking away, saying, "I don't want no problems."

---

[3] The jury heard that Sabrina had a 2012 misdemeanor conviction for violating section 530.5, a 2017 arrest for burglary, a 2018 conviction of auto theft, a 2021 arrest for narcotics in the jail, and a 2021 arrest for possession of narcotics and a firearm.

Chase and Cody, both armed with knives, ran after Fortuin. Sabrina, Johnny, and a driver passing by described the fight. One of the brothers stabbed Fortuin in his side in the middle of the street while Fortuin retreated. Fortuin then stumbled across the road to a truck, covering his head with his arms. The brothers followed and repeatedly stabbed him.

Johnny saw both brothers carrying weapons, with Cody carrying a small knife and Chase carrying something long and pointy. Cody swung at (but missed) Fortuin's chin while Fortuin walked toward him in a manner suggesting he would "plow right over" him. But, after accusing the brothers of trying to stab him, Fortuin fled about 100 yards away to the other side of the street. Chase caught up to Fortuin near a truck and stabbed him in the side. Cody caught up afterward. At some point, Fortuin swung at the brothers. In Johnny's count, Chase stabbed Fortuin two or three times and Cody swung at Fortuin about four times with a knife—though he did not know whether Cody ever connected.

A driver passing by with his son also saw Chase and Cody attack Fortuin, though he saw no weapons. Both brothers swung punches at Fortuin. Fortuin retreated and repeatedly said, "No. Don't. Stop." But the brothers continued to attack him. Fortuin tried to defend himself, "thrust kicked" one of the brothers, and tried to get away. The passing driver, becoming concerned for his own son's safety, drove away as the fight continued.

Officers arrived shortly after, finding Fortuin dead with multiple stab wounds. According to one officer, Fortuin was "a short walking distance" from the red-tagged house, "just over two football fields." Officers never found the stick that Fortuin allegedly held. But, they later found two knives associated with the attack on Fortuin: Cody's Swiss Army knife with three blades, each measuring (or just shy of) two and one-half inches long, and Chase's knife with a fixed blade measuring four to five inches long. Fortuin's DNA was found on both knives.

4

A forensic pathologist examined Fortuin and found he suffered 12 stab wounds. Some stab wounds were more consistent with Cody's knife. Other stab wounds were more consistent with Chase's knife. The remaining stab wounds could have been caused by either knife, including one that touched the heart's surface and two others that penetrated three inches into the chest and stomach. The pathologist acknowledged that some of these wounds went deeper than the length of Cody's knife. But she explained that a wound's depth can exceed a blade's length when the knife is thrust into the body. She believed that Fortuin died of multiple stab wounds and that each wound could have contributed to his death.

The day after Fortuin's death, officers found Chase and Cody in Nevada. Chase denied being in the area of the murder the preceding day, and instead claimed that he was in Nevada. He denied seeing Fortuin that day or having a knife.

Cody also initially told officers he was in Nevada at the time of Fortuin's death, but ultimately admitted he was at the red-tagged house, described his history with Fortuin, and discussed the stabbing.

Law enforcement allowed Chase to speak with Cody at the sheriff's office in Nevada but recorded the conversation. Cody told Chase, "[T]hey've figured us out." Chase said, "You didn't do anything." Cody replied, "I did. I mean I had the knife too," and, "Whether I got [him] or not, I mean, I tried to."

Cody and Chase were both later charged with first degree premeditated murder (§§ 187, subd. (a), 189, subd. (a)) committed with a deadly weapon (§ 12022, subd. (b)(1)).

During a jury instruction conference, the prosecutor argued the evidence did not support an affirmative defense of complete self-defense but acknowledged that instruction on imperfect self-defense was a reasonable request. Defense counsel responded, "I can't believe I'm agreeing" with the prosecutor and admitted, "[t]here wasn't . . . enough evidence" of perfect self-defense. Defense counsel also stated he did

5

not want the instruction regarding justifiable homicide based on self-defense, CALCRIM No. 505.

Defense counsel requested that the jury be instructed on voluntary manslaughter, based on heat of passion or provocation, as a lesser included offense. With respect to this instruction, the parties debated whether the instruction should include an optional paragraph that stated, "If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." The prosecutor argued that the evidence showed there were two separate and distinct portions of the assault: one occurred in the middle of the road and the other occurred several hundred yards away, near the truck. Defense counsel argued that the event constituted one continuous criminal act. After conducting additional research on the issue, the trial court found that including the language regarding the cooling-off period was appropriate.

During closing argument, the prosecutor argued that the killing was not manslaughter, in part because, "if enough time passed between a supposed provocation and the killing for an average person to cool off and regain his judgment, then the killing cannot be reduced to manslaughter." The prosecutor argued those circumstances were present in this case, where the brothers "chose to chase the victim down the driveway. They made that decision, even though the victim had turned away from them and was walking away from the property. We know that the victim was stabbed one time in the street, injured, and then again backpedaled to the broken-down truck and stabbed again approximately 12 times, with again the victim yelling, No. Don't. Stop. There was no provocation and there was certainly a cooling off period by the time they reached the victim in the street and certainly when the mortal wounds were inflicted on [Fortuin]." In his closing argument, defense counsel did not address the existence of a cooling-off period but rather argued that Fortuin generally constituted a threat, it was reasonable to

6

believe he was going to hurt Chase again, and that the prosecution could not prove Chase did not act in the heat of passion.

The jury found Chase and Cody not guilty of first degree murder but found both guilty of second degree murder. For each brother, the jury found true the allegation that he used a deadly weapon. The trial court sentenced both Chase and Cody to 15 years to life for the murder plus a consecutive year for the use of a deadly weapon.

## DISCUSSION

### I

### *Affirmative Defenses*

Chase contends the trial court violated its sua sponte duty to instruct the jury regarding two defenses: defense of self or another and defense of property. He acknowledges that defense counsel elected not to rely on either affirmative defense at trial but argues that because substantial evidence nevertheless supported these defenses, trial court error and/or ineffective assistance of counsel deprived the jury of the ability to fully consider the issues. We disagree.

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Anderson* (2011) 51 Cal.4th 989, 996.) That duty extends to instructions regarding an affirmative defense that is not inconsistent with the defendant's theory of the case if substantial evidence supports the defense. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) We independently review claims that the trial court failed to properly instruct the jury on the applicable principles of the law (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 850), as well as claims that the trial court has a duty to give a particular jury instruction sua sponte (*People v. Simon* (2016) 1 Cal.5th 98, 133).

A. Defense of Self or Another

"Homicide, the killing of one human being by another, is not always criminal.  In certain circumstances, a killing may be excusable or justifiable."  (*People v. Elmore* (2014) 59 Cal.4th 121, 132.)  "Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime."  (*Id*. at pp. 133-134.)  This is known as " 'perfect [or complete] self-defense.' "  (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)  If the belief subjectively exists but is objectively unreasonable, there is " 'imperfect self-defense,' " i.e., " 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' " but can be convicted of manslaughter. (*Ibid*.)

While the prosecution has the burden of proof beyond a reasonable doubt for every element of the offense, justification and excuse are affirmative defenses and the defendant has the burden of raising them.  (See *People v. Neidinger* (2006) 40 Cal.4th 67, 72 [it is constitutionally permissible to place on the defendant the burden of proving affirmative defenses, as long as the defendant is not required to negate an element of the offense].)  If the record contains substantial evidence—evidence sufficient for a reasonable jury to find in favor of the defendant—of an affirmative defense, a defendant has a right to have the trial court so instruct the jury.  (*People v. Salas*, *supra*, 37 Cal.4th at p. 982.)  " 'A trial court's duty to instruct, sua sponte, on particular defenses arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' "  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1052.)  If there is sufficient evidence of justification or excuse, their absence is an element of the crime, and the People bear the ultimate burden of persuasion on the issue. (*People v. Curtis* (1994) 30 Cal.App.4th 1337, 1353.)  "Thus, lack of justification or

excuse has been called 'a negative rather than an affirmative element' of the crime." (*Ibid*.)

CALCRIM No. 505 pertains to justifiable homicide through self-defense or defense of another. The last paragraph of the form instruction states, "The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified. If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter/ attempted murder/ [or] attempted voluntary manslaughter)." (CALCRIM No. 505.) CALCRIM No. 520 instructs the jury on the necessary elements to prove first or second degree murder that may be modified to account for the affirmative defense of self-defense. The form instruction provides, in relevant part: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] [1A. The defendant committed an act that caused the death of (another person/ [or] a fetus);] [¶] . . . [¶] [AND] [¶] 2. When the defendant (acted/ [or] failed to act), (he/she) had a state of mind called malice aforethought(;/.) [¶] *<Give element 3 when instructing on justifiable or excusable homicide.>* [¶] [AND [¶] 3. (He/She) killed without lawful (excuse/ [or] justification).]"

In this case, defense counsel agreed that there was insufficient evidence to justify instructing the jury on justifiable or excusable homicide based on perfect self-defense. The court did, however, instruct the jury with the first two points of CALCRIM No. 520.

Chase's arguments on appeal are a bit confusing. In his opening brief, Chase appears to challenge trial counsel's "tactical decision" to forgo complete self-defense as an affirmative defense and the trial court's failure to sua sponte instruct with CALCRIM No. 505 on complete self-defense. By example, in his opening brief he states: "Thus was counsel ineffective in disclaiming reliance on a theory that he actually argued [complete self-defense], and the trial court erred in failing to instruct sua sponte on complete self-defense." However, in response to the People's arguments against these grievances, Chase contends in his reply brief that he does not challenge trial counsel's

9

tactical decision not to seek an instruction on complete self-defense, and he concedes that the state of the evidence did not warrant the trial court instructing on such theory on its own. Rather, Chase contends that because the prosecution's evidence amounted to substantial evidence that his conduct was justifiable self-defense, the prosecution had the burden to prove the "affirmative element" of *absence* of self-defense. (See § 189.5, subd. (a) [a defendant charged with murder generally has the burden of establishing self-defense, but not when "the proof on the part of the prosecution tends to show" the defendant acted in self-defense].) He contends that "by withdrawing the instruction on complete self-defense, the trial court eliminated self-defense as an essential element of the prosecution's case and shifted the burden to the defendants." In his reply brief, he clarifies that the jury should have been instructed with the last paragraph of CALCRIM No. 505, namely that "The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter." For the following reasons, we disagree.

First, the requirement that a jury be instructed on complete self-defense is only required when the evidence supports the giving of such instruction. *People v. Frye* (1992) 7 Cal.App.4th 1148, 1155-1156, supports our conclusion. In that case, the defendant was convicted of murder and attempted murder after the trial court instructed the jury that a killing or attempted killing was unlawful unless it was either excusable or justifiable. (*Id*. at p. 1151.) It went on to instruct the jury that " 'it is undisputed in this case that each of the acts in question was an unlawful act.' " (*Ibid*.) The defendant contended that this instruction improperly directed the jury's verdict on disputed factual issues. A different panel of this court disagreed, explaining that "the word 'unlawful' in the various homicide instructions simply means that there was no excuse or justification for the killing. In this sense it is a negative rather than an affirmative element of the homicide offenses. Because there was no issue of excuse or justification tendered or

10

raised in this case, the trial court did not direct a verdict on either an affirmative element of the charged crimes or on a defense to those crimes." (*Ibid.*) The *Frye* court further explained that excuse and justification are affirmative defenses that must be raised by the defendant. (*Id.* at p. 1154.) Unlike the other two elements of murder, these affirmative "defenses are not elements of the offenses which the prosecution is required to prove *unless they are properly raised . . . .*" (*Id.* at p. 1160, italics added.) The *Frye* court thus concluded that "excuse and justification are affirmative defenses which need not and should not be put before the jury in the absence of some evidence supporting them or defense reliance upon them." (*Id.* at p. 1159.) "Under this scheme we treat the absence of excuse or justification, and hence the question of unlawfulness, as an element of an offense only if such a defense is raised in some manner." (*Ibid.*)

The reasoning in *Frye* leads us to conclude that the instructional requirement that the prosecution prove the absence of self-defense is required only when self-defense is properly raised, i.e., where sufficient evidence supports it. Indeed, the usage instructions of CALCRIM No. 520 support this conclusion.

Between element Nos. 2 and 3 in CALCRIM No. 520, the instruction notes "*<Give element 3 when instructing on justifiable or excusable homicide.>*" (Judicial Council of Cal., Crim. Jury Instns. (2025), p. 251.) Jury instructions in "[i]talicized notes between angle brackets in the language of the instruction itself signal important issues or choices." (Judicial Council of Cal., Crim. Jury Instns. (2025) Guide for Using Judicial Council of Cal. Crim. Jury Instns., p. xxiii.) The Bench Notes to CALCRIM No. 520 offer further clarification in relevant part: "The court has a sua sponte duty to instruct on the first two elements of the crime. If there is sufficient evidence of excuse or justification, the court has a sua sponte duty to include the third, bracketed element in the instruction." (Judicial Council of Cal., Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 520, p. 253.) Thus, the notes in CALCRIM No. 520 clearly indicate that the third element is only required when CALCRIM No. 505 is also justified.

11

Because the language in the third element mirrors that of the last paragraph of CALCRIM No. 505, the same reasoning applies to Chase's argument.

Self-defense was not relied upon by Chase at trial nor, as trial counsel acknowledged, did the evidence support instructing the jury on self-defense. In support of his argument to the contrary, Chase states that Fortuin was a good fighter, around six foot two, who (about five weeks before the stabbing) had a violent encounter with Chase and his friends when Fortuin forced entry into the red-tagged house and hit both brothers on the arm with a bat or a pipe (denting Chase's arm) while accusing them of stealing a generator. Later that same day, Fortuin had a violent encounter with Johnny and Tanya. On the day of the murder, Fortuin came to the red-tagged house, possibly to steal a battery. According to some witnesses, Fortuin carried a stick or short pole, which he may have concealed up his sleeve as he approached the red-tagged house. But none of the evidence suggests that, when the brothers ran after the retreating Fortuin and stabbed him, Chase reasonably believed killing Fortuin was necessary to avert an imminent threat of death or great bodily injury. On this record, no rational juror could find that Chase justifiably killed Fortuin in perfect self-defense. (See *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649 [no substantial evidence supporting self-defense where neither defendant described being attacked by anyone and other evidence showed that they executed a surprise attack on the victims and brutally murdered them]; *People v. De Leon* (1992) 10 Cal.App.4th 815, 825 [no substantial evidence showed the defendant honestly believed he was in imminent peril when he had "fir[ed] at men who had turned and started to walk away"].) Even considering Fortuin's violent encounter with the brothers five weeks prior, Fortuin's physical stature and general history of violence, as well as the assumption (for these purposes) that Fortuin arrived armed—the right to attack, pursue, and kill Fortuin is simply not supported by the evidence. (See *People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082 [to kill in self-defense, a defendant must actually and reasonably fear " '*imminent* danger to life or great bodily injury' "].) This conclusion is

12

not undermined by Fortuin's limited efforts to defend himself against the two armed brothers who pursued him. (See *In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [self-defense "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified"].)

Contrary to Chase's contention, there is no evidence of self-defense and, as *Frye* and CALCRIM No. 520 both instruct, the jury was not required to be instructed on the prosecution's burden to prove the absence of self-defense. (*People v. Frye*, *supra*, 7 Cal.App.4th at p. 1159.) Because *Frye* teaches that instructions on justifiable or excusable homicide need not and should not be put before the jury in the absence of supporting evidence or reliance upon them, the court properly omitted the language regarding the prosecution's burden to prove the absence of self-defense.

Furthermore, Chase cites no authority, and we are aware of none, that mandates or even allows the jury to be instructed on only the portion of an affirmative defense pertaining to the prosecution's duty to disprove the affirmative defense. Rather, jury instructions must be "complete and correctly state the law. (*People v. Anderson* (1966) 64 Cal.2d 633, 641.) Jury instructions must be read together and understood in context as presented to the jury." (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10.) Indeed, this case presents a perfect example of the import of this rule. Without instructions on what constitutes self-defense, the jury has no context within which to determine whether the People have proven its absence. In sum, we are not persuaded by Chase's argument that the trial court had a sua sponte duty to educate the jury on one paragraph from CALCRIM No. 505 without the broader context of the full instruction. And, because the full instruction is not supported by the evidence in this case, there was no error in excluding the paragraph.

Chase relatedly argues that he received ineffective assistance because his trial counsel failed to object to the court's omission of the prosecution's burden to disprove

self-defense, which, he contends, effectively conceded guilt on that issue. We cannot fault Chase's trial counsel for failing to request instruction on a defense that lacked evidentiary support. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 434 ["Counsel cannot have been ineffective for failing to seek an instruction for which there was no supporting evidence"].)

B. Defense of Property

Chase also contends substantial evidence supported instructing the jury on defense of property and the trial court erred in failing to sua sponte instruct the jury with the corresponding jury instruction for that defense—CALCRIM No. 3476. We reject this argument as well.

Defense of property is codified in Civil Code section 50, which states in relevant part, "Any necessary force may be used to protect from wrongful injury the person or property of oneself." CALCRIM No. 3476 also explains that an owner of property "may use reasonable force to protect that property from imminent harm." Case law also explains that the threatened harm must be imminent. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064 [a threatened wrongful injury "must be imminent" to trigger the right to defense].) If substantial evidence supports the defense and it is not inconsistent with the defendant's theory of the case, a trial court has a sua sponte duty to instruct on it. (*People v. Salas*, *supra*, 37 Cal.4th at p. 982.)

Asserting an instruction under CALCRIM No. 3476 was warranted, Chase contends the evidence demonstrates Fortuin approached the red-tagged house intending to steal a battery. It is true that, according to Sabrina, Fortuin walked to the house to retrieve a car battery for a friend. And, according to Johnny, Fortuin had no property at the house at this time. There were two inoperable cars parked at the property, one of which belonged to Cody. The record does not disclose, however, whether either car had a battery. Nevertheless, Chase contends this evidence demonstrates that Fortuin must have been planning to steal a car battery.

14

While Chase acknowledges that an attempted theft would not justify the use of deadly force (see *People v. Ceballos* (1974) 12 Cal.3d 470, 483), he contends that it justified *some* of the brothers' response and, once Fortuin tried to defend himself, the brothers were fully justified in using deadly force. He reasons that Fortuin had superior size and strength and, even if unarmed, posed a threat of great bodily injury against the two knife-wielding brothers. However, Chase has not identified any property of his own that he sought to protect. The evidence does not even establish that Fortuin intended to steal the battery from Cody's car. Nor is there any evidence that either Chase or Cody knew Fortuin was approaching the red-tagged house to steal a battery. This does not constitute substantial evidence that force was necessary to prevent the imminent theft of the brothers' property.

Even assuming Fortuin intended to steal the car's battery, and assuming further the brothers somehow knew of this intent, the brothers still would not have been justified in their conduct. Nothing in the record suggests that Fortuin was anywhere near either car or trying to steal anything, as he had already turned around and started to walk away from the property when the brothers attacked him. No rational trier of fact could agree that the brothers' conduct in displaying knives and trying to punch and/or stab Fortuin as Fortuin was retreating was necessary to prevent a theft, let alone necessary to prevent an imminent theft.

II

*Cooling-off Instruction*

As noted, the jury was instructed on voluntary manslaughter based on killing in the heat of passion. Chase contends, however, the trial court prejudicially erred in including optional language within the instruction that a defendant does not kill in the heat of passion (and therefore commit voluntary manslaughter), "[i]f enough time passed between the provocation and the killing for a person of average disposition to 'cool

15

off' . . . ." Chase argues this paragraph should have been omitted because based on the evidence, the jury could not find that he had time to cool off. We disagree.

" 'A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.' " (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 218.) " ' "When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner." ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 313.)

Murder generally requires a defendant to act with malice. But a defendant who kills in a heat of passion lacks the requisite malice for murder, reducing what would otherwise be murder to voluntary manslaughter. (§ 192, subd. (a); *People v. Beltran* (2013) 56 Cal.4th 935, 942.) "Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*Beltran*, at p. 942.) The provocative conduct may be physical or verbal, and it may comprise a single incident or numerous incidents over a period of time. (*People v. Le* (2007) 158 Cal.App.4th 516, 528.) But a defendant cannot claim to have acted in a heat of passion "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored." (*Beltran,* at p. 951.)

The trial court's instructions here accurately relayed the law on heat of passion. The court explained that a defendant kills in the heat of passion if: (1) "[t]he defendant was provoked," (2) "[a]s a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment," and (3) "[t]he provocation would have caused a person of average disposition to act rashly and without

16

due deliberation, that is, from passion rather than judgment." The court also instructed on cooling-off, stating: "If enough time passed between the provocation and the killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." Although Chase contends this last portion regarding the cooling-off period was unwarranted under the facts of this case, he does not assert that it is an incorrect statement of law.

We note that the jury could have believed that Fortuin provoked Chase by attacking him with a pipe five weeks prior but that since then there was a sufficient cooling-off period such that the heat of passion defense no longer applied on the day the brothers killed Fortuin. Under these circumstances, the language was warranted. Chase does not address the possibility of such an interpretation of facts, and we acknowledge that was not the prosecution's theory at trial.

Instead, the prosecutor's theory was that, assuming the provocation was over a period of time, on the day of the murder Chase attacked Fortuin twice—with a period of time in between the attacks sufficient to provide a cooling-off period. Chase's primary argument is that this theory (delivered in closing argument) "missed the mark because there had been a lengthy history of violent issues with Mr. Fortuin," and there was conflicting evidence with respect to the distance over which the attack took place.

Assuming Chase is correct in contending there was not substantial evidence to support the optional language regarding the cooling-off period, as argued by the parties at trial, he fails to persuade us he was prejudiced by this error. If the jury agreed with Chase that there was no cooling-off period, it was free to disregard that portion of the instruction as inapplicable in this case. The court also instructed the jury: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about

17

the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." (CALCRIM No. 200)

"Where, as here, the court gives a legally correct, but irrelevant, instruction, the error 'is usually harmless, having little or no effect "other than to add to the bulk of the charge." ' " (*People v. Lee* (1990) 219 Cal.App.3d 829, 841.) A reversal is required "only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 178, disapproved on other grounds in *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7; see § 1259 [appellate review is permitted to the extent an unchallenged instructional error affects a defendant's "substantial rights"].) Here, there is no such reasonable probability of a more favorable outcome absent the unwarranted language regarding the cooling-off period. Indeed, " 'The very fact which makes the instruction . . . erroneous—absence of any evidence to support it—suggests that the jury ignored this dim will-o'-the-wisp and passed on to the tangible issues in the case.' " (*Solgaard v. Guy F. Atkinson Co.* (1971) 6 Cal.3d 361, 371.) We see no reason to reverse on this ground.

III

*Witness Impeachment*

Chase contends the trial court wrongly excluded evidence about Sabrina's past misconduct—namely, her prior arrests for identity theft—and deprived him of due process. We reject this argument.

A defendant has a "due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) To this end, a defendant may generally cross-examine a witness to test the witness's credibility. (*People v. Pearson* (2013) 56 Cal.4th 393, 455.) Furthermore, "a witness may be impeached with any prior conduct involving moral turpitude," including a prior theft. (*People v. Parker* (2022) 13 Cal.5th 1, 55; see

*In re Honoroff* (1975) 15 Cal.3d 755, 758.) But that does not mean that a party can always question a witness about prior conduct involving moral turpitude. Under Evidence Code section 352, "trial courts possess broad latitude to exclude examination concerning a witness's prior [conduct] if it finds the prejudicial impact substantially outweighs its probative value." (*Parker*, at p. 55.) "When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the witness's honesty or veracity[ and] whether it is near or remote in time . . . ." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude." (*Id.* at pp. 931-932.)

"A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.) However, any error in a trial court ruling admitting or excluding evidence requires reversal only if, after review of the entire record, it is reasonably probable that a result more favorable to a defendant would have occurred in the absence of the error. (*People v. Zataray* (1985) 173 Cal.App.3d 390, 401.)

In this case, the trial court allowed the following evidence as impeachment for Sabrina: a 2017 arrest for first-degree burglary, a 2021 arrest for possessing narcotics while armed with a firearm, and a 2021 arrest for bringing narcotics into jail, a 2018 conviction for car theft, and a 2012 misdemeanor conviction for identity theft. The court did not allow the defense to impeach Sabrina with her arrests in 2011 and 2012 for identity theft, reasoning that these arrests related to the same conduct that resulted in the

19

2012 conviction and so were less compelling, too prejudicial, and would unduly consume time if admitted.

On the record before us, we cannot say that the trial court abused its discretion in excluding the arrests for identity theft. (See *People v. Parker*, *supra*, 13 Cal.5th at p. 55 [noting trial court's "broad latitude" to prevent examination on a witness's prior conduct].) Critically, Chase was not precluded from attacking Sabrina's credibility through several instances of impeachment evidence. Indeed, Sabrina admitted she had prior "run-ins with the law" due to problems with drugs, guns, and theft. (See *Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [" 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish' "].) In light of the impeachment evidence that was introduced, the two additional arrests for identify theft were not of *significant* probative value and their inclusion as impeachment evidence could not have affected the outcome of the case. Thus, it is not reasonably probable that a result more favorable to Chase would have occurred had the trial court permitted Sabrina to be impeached with additional arrests. (*People v. Brooks* (2017) 3 Cal.5th 1, 52.)

IV

*Character Evidence*

Next, Chase contends that the court erred in prohibiting Sabrina to testify about Fortuin's temper. He argues whether Fortuin had a temper was relevant and admissible under Evidence Code sections 351 and 1103. He further contends that Fortuin's temper is the sort of character evidence that is admissible when offered to prove Fortuin's conduct in conformity with that trait. According to Chase, because Sabrina was Fortuin's intimate partner, she was the appropriate person to describe Fortuin's temper.

Evidence of a person's character is generally inadmissible to prove that person acted in conformity with his or her character, or trait of character, on a given occasion.

(Evid. Code, § 1101, subd. (a).)  Evidence Code section 1103, subdivision (a)(1) states an exception to this general rule:  "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is:  [¶]  (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  A defendant being prosecuted for homicide or an assaultive offense, and who asserts self-defense, may introduce evidence of specific violent acts by the victim on a third person to show that the victim has a violent character and was the aggressor in the current offense.  (*People v. Wright* (1985) 39 Cal.3d 576, 587.)

The admission of the victim's character evidence pursuant to Evidence Code section 1103 is still subject to evidentiary rules of relevance (Evid. Code, §§ 210, 350, 351) and prejudice (Evid. Code, § 352).  (*People v. Wright*, *supra*, 39 Cal.3d at pp. 587-588.)  The court may exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.  (*People v. Minifie*, *supra*, 13 Cal.4th at pp. 1069-1070.)

We review the trial court's rulings on the admissibility of evidence for abuse of discretion.  (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266.)  Under this standard, a trial court's ruling "will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

At trial, Cody's counsel asked Sabrina whether Fortuin had a temper and whether she was present when Fortuin got angry.  Each time, the prosecutor objected on the basis of relevancy and improper character evidence.  Each time, the trial court sustained the objection.  The trial court did not provide a basis for the ruling, nor did defense counsel seek one.

21

For purposes of this argument, we accept Chase's argument that evidence that a person has a "temper" is relevant and may be admissible to reflect a character trait contemplated by Evidence Code section 1103. The statute permits the introduction of evidence of "a trait of character." One "trait of character" is difficulty in controlling one's temper. The phrases *difficulty in controlling one's temper* and *poor anger management* are euphemisms for the tendency in a person to allow anger to escalate into violence. Often that violence is merely verbal, but the very loss of control creates the risk it will become physical.

However, we disagree that the court's exclusion of this evidence violated due process. A defendant has a due process right to "present all relevant evidence of significant probative value to his or her defense." (*People v. Cunningham*, *supra*, 25 Cal.4th at p. 999.) However, the defendant "has no constitutional right 'to present all relevant evidence in his favor, no matter how limited in probative value such evidence will be so as to preclude the trial court from using Evidence Code section 352.' " (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 450.) "Although the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*Cunningham*, at p. 999.) Thus, a trial court's "application of ordinary rules of evidence . . . generally does not infringe upon this right [to present a defense]." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Furthermore, "[o]ur task is to review the trial court's ruling, not its reasoning. ' "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which

may have moved the trial court to its conclusion." ' " (*People v. Turner* (2020) 10 Cal.5th 786, 807.)

We conclude that the court did not err in preventing Sabrina from answering whether Fortuin had a temper or whether she had been present when he got angry. Defense counsel was not prohibited from inquiring into Fortuin's past instances of violence, or from providing solid evidence of Fortuin's willingness to engage in violence against third parties, including Chase and Cody. Indeed, the jury heard evidence that Fortuin hit Chase and Cody with a pipe, denting Chase's arm. The jury also heard about various violent encounters with Johnny and Tanya, as well as an instance of violence against a woman whom he dragged down the driveway by her hair and sucker-punching Johnny's brother in the back of the head before tearing out a chunk of his hair to adorn a tree with. The jury was more than equipped to determine whether Fortuin had a "temper" without Sabrina's opinion on the matter. Thus, Sabrina's opinion had minimal probative value and its exclusion under Evidence Code section 352 was permissible. For the same reasons, any error in the exclusion of her opinion did not result in a reasonable probability that Chase would have obtained a more favorable outcome. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 828.)

V

*Cumulative Error*

Chase further contends that the cumulative effect of the alleged errors deprived him of his federal due process right to a fair trial. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' " (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

23

We have found no errors impacting Chase's right to a fair trial so there is nothing to accumulate.

### DISPOSITION

The judgment is affirmed.

 

_____/s/_____
EARL, P. J.

We concur:

_____/s/_____
MAURO, J.

_____/s/_____
RENNER, J.